**CHAMBERSBURG AREA SCHOOL DISTRICT, Appellant**

v.

**CHAMBERSBURG EDUCATION ASSOCIATION (PROFESSIONAL) and Shawn Shreffler.**

Commonwealth Court of Pennsylvania.

Argued June 15, 2015.
Decided July 8, 2015.

Richard B. Galtman, Huntingdon Valley, for appellant.

BEFORE: ROBERT SIMPSON, Judge, and P. KEVIN BROBSON, Judge, and JAMES GARDNER COLINS, Senior Judge.

OPINION BY Judge P. KEVIN BROBSON.

Chambersburg Area School District (CASD), appeals from an order of the Court of Common Pleas of the 39th Judicial District, Franklin County Branch (trial court), denying its petition to vacate an arbitrator's award. For the reasons discussed below, we affirm.

Shawn Shreffler (Shreffler) is a fifth grade teacher at Hamilton Heights Elementary School in CASD, a job he has held for more than two decades. As an elementary school teacher, Shreffler is protected under the collective bargaining agreement (CBA) between CASD and the Chambersburg Area Education Association (Association), the recognized bargaining unit of CASD's professional employees. Beginning with the 1997–1998 season, Shreffler was also hired as the Head Coach of the varsity boys' basketball team. Shreffler continued to serve as Head Coach through the end of the 2011–2012 season. Thereafter, on April 25, 2012, the School Board (Board) voted 5–4 not to reappoint Shreffler as Head Coach. On August 8, 2012, the Board appointed someone else to fill the position beginning with the 2012–2013 season.

On April 27, 2012, the Association filed a grievance on behalf of Shreffler, via telephone, with the principal of Hamilton Heights Elementary. The Association alleged that CASD violated the CBA and past practice when the Board voted not to retain Shreffler as Head Coach without just cause. The principal denied the grievance later that day. The grievance was thereafter submitted to and denied by both the CASD Superintendent and the Board.

Although CASD maintained that Shreffler's dismissal as Head Coach was not arbitrable, the parties proceeded to arbitration and selected Diana S. Mulligan as arbitrator (Arbitrator). The parties agreed to bifurcate the hearing, and testimony taken at the first hearing on March 5, 2013, was limited to whether or not "a member of a professional bargaining unit can avail himself of any contractual and/or legal rights when he is functioning as a coach." (Reproduced Record (R.R.) 23a.) On June 3, 2013, the Arbitrator issued her first award (First Award), finding that the grievance was arbitrable. The Arbitrator identified relevant provisions of the CBA, including Article I, Sections 1.2 (defining the bargaining unit) and 1.5.B (other exclusions from the bargaining unit), Article II, Section 2.6 (just cause provision), Article IV, Section 4.1 (reservation of power by the Board), Article X, Sections 10.1 (grievance procedure) and 10.2 (restrictions on arbitration), Article XIII, Sections 13.3 (salary payment) and 13.4 (extra-duty pay schedule), and Exhibit E (exhibit listing extra-duty pay per advisor). The Arbitrator noted that this was an issue of first impression between CASD and the Association and that the arguments addressed, inter alia, "just cause, the right of [CASD] to unilaterally appoint/retain coaches, the fact that coaches' salaries are bargained for and appear in the CBA, the role of past practice in retention of coaches, management rights, limitations on an Arbitrator's authority, and the finality clause." (R.R. 23a.) The Arbitrator explained that the "key to the solution of the instant problem is Section 1.5.B, referred to by [the Pennsylvania State Education Association (PSEA) Field Director for the Southern

Region] as excluding the professional bargaining unit members from the exclusions." (R.R. 23–24a.) Article I, Section 1.5.B provides:

The following employees of [CASD] are agreed by the parties not to be included within the bargaining unit as defined aforesaid. It is further agreed that nothing contained in this agreement shall apply to such employees, and that nothing contained in this agreement shall apply to the benefit of any person otherwise a member of the bargaining unit while employed in any such position unless such person has been specifically directed by [CASD] to perform such duties in his or her capacity as a professional employee:

. . .

B. Any person engaged in the summer recreational program, or any recreational program in which such employee's participation is a matter for such employee's voluntary participation. *This clause shall not include employees otherwise members of the bargaining unit engaged in supervising, advising, or assisting in the conduct of any extracurricular activity recognized as such by [CASD].*

(R.R. 351a (emphasis added).) The Arbitrator reasoned:

If the Section B. language was restricted to summer recreational programs, [CASD] might have prevailed on the arbitrability issue, but that provision also includes "any recreational programs" in which an employee voluntarily participates. There was no testimony or evidence showing which party proposed that language or what their intent was in so doing. Mr. Schreffler [sic] is a [CASD] employee and was not forced to be a basketball coach. In its brief (p.15), [CASD] argues that Section B. is irrelevant because "any recreational pro-

gram" has nothing to do with coaching positions or athletic events. I disagree. Playing basketball is not a Pennsylvania Department of Education (PDE) requirement for graduation. Although basketball may be among those after school activities referred to as a "sport," sports are clearly extra-curricular recreational activities. Basketball is also recognized as an activity by [CASD] since the various positions and their attendant salaries are in the CBA. The basketball coach certainty supervises the conduct of games and may advise his/her assistants in how to conduct the game. It is this contractual language which tipped the scales in favor of arbitrability.

(R.R. 24a.) Thus, the Arbitrator concluded: "Under the language of Article I, Section 1.5.B., a professional employee who is also employed by the CASD as a basketball coach, has the right to file a grievance and take it to arbitration should efforts at settlement be unsuccessful." (R.R. 24a.)

At the second hearing, the Arbitrator considered whether CASD violated the CBA when it failed to reappoint Shreffler as Head Coach for the 2012–2013 season, and, if so, what remedy was available. The Arbitrator issued her second award (Second Award) on February 12, 2014, finding that the Board did not have just cause to remove Shreffler as Head Coach and ordering Shreffler be reinstated for the 2013–2014 season and compensated for lost wages.

The Arbitrator explained:

The just cause provision in the instant [CBA] states only that an "employee" cannot be reduced in compensation without just cause. Other [CASD] employees are specifically excluded from seeking relief under the professional employees' [CBA] and the professional employees are then excluded from the exclusions. An Arbitrator can only interpret the

contract negotiated by the parties themselves.

. . .

[CASD] also invokes the Management Rights clause (Sec. 4.1) which states, inter alia, that, unless there is an express agreement to restrict any lawful power of the School Board or make the exercise of such power the subject of the grievance procedure, the Management Rights clause prevails. The School Board abrogated the right not to renew a coach's contract when it agreed to Section 1.5B. [CASD] is correct when it argues that the Association never challenged the right of [CASD] to unilaterally hire a coach, but hiring is not the issue in the instant case.

This Award by no means guarantees that a coach has the automatic right to continue in that job and that the School Board has no right to replace him or her. But, because of the specific language of Section 1.5B, the right to continue as coach or be replaced is subject to the just cause provisions of the CBA. [CASD], anticipating a finding that just cause does apply, argues that it had sufficient reason not to retain Schreffler [sic].

(R.R. 40–41a.)

The Arbitrator then concluded that none of CASD's proffered justifications satisfied the just cause provision. The Arbitrator found it "obvious" that the Head Coach position was given to someone else because of "1 or 2 disgruntled parents," that any alleged belittling behavior was mentioned only in very general terms, that the testimony of the Board members was too vague to support a just cause finding as it concerned only "unspecified motivational 'tactics' . . . [and] other 'issues and concerns,'" and that the mild profanity Shreffler admitted to sometimes using was both insufficient cause and not the actual reason for his firing. (R.R. 41–42a.)

It is very apparent from the evidence that Mr. Schreffler's [sic] non-renewal had nothing to do with just cause but was the result of pressure from the Stahls who asked for numerous concessions for their son, were granted most of those requests, but were very unhappy when [their son] Mitch did not start the January 9th game nor was he allowed to continue when Mr. Schreffler [sic] decided he was behaving inappropriately. There is no other conclusion which can be drawn since Mr. Schreffler's [sic] alleged improper behavior was mild compared to the disgusting and egregious behavior displayed by the football coach who suffered no adverse consequences.[1]

. . .

In conclusion, only because of the language· in Section 1.5B of the parties' CBA does just cause apply to the retention of coaches. [CASD] was unable to show through competent testimony and evidence that there was just cause for not retaining [Shreffler] as Head Basketball Coach.

(R.R. 42a.)

After the Second Award was issued, CASD filed a petition in the trial court to vacate both Awards. The trial court denied CASD's petition, concluding that the Arbitrator's Awards were within the scope of the CBA and rationally derived from the CBA.

On appeal to this Court, CASD argues that the Awards are not within the scope of the CBA because (1) Section 1.5.B does

---

1. Traci Hanser, a CASD Athletic Trainer, testified that the football coach called her a "cunt" in front of his team and was·only "dressed down" after she made multiple complaints. (R.R. 33a.)

not include professional employees acting as coaches, (2) the grievance was automatically resolved under Section 10.2, (3) the grievance procedure outlined in Article X is limited to professional employees, (4) the CBA does not address the appointment of coaches, and (5) the just cause provision does not apply to coaches.[2] CASD also argues that the awards are not rationally related to the CBA because the Arbitrator "blant[ly] disregard[ed] multiple provisions of the CBA." (CASD's Br. at 40.)

■ When reviewing an arbitrator's interpretation of a CBA, the essence test is the proper standard of review. *Luzerne Intermediate Unit No. 18 v. Luzerne Intermediate Unit Educ. Ass'n, PSEA/NEA*, 89 A.3d 319, 324 (Pa.Cmwlth.2014). "The essence test is a two prong test under which an award should be upheld if (1) the issue as properly defined is within the terms of the collective bargaining agreement and (2) the arbitrator's award can be rationally derived from the collective bargaining agreement." *Coatesville Area Sch. Dist. v. Coatesville Area Teachers' Ass'n/Pa. State Educ. Ass'n*, 978 A.2d 413, 415 n. 2 (Pa.Cmwlth.2009) (citing *State Sys. of Higher Educ. (Cheyney Univ.) v. State Coll. Univ. Prof'l Ass'n (PSEA–NEA)*, 560 Pa. 135, 743 A.2d 405, 413 (1999)), *appeal denied*, 605 Pa. 677, 989 A.2d 10 (2010). We are not required to agree with the arbitrator's interpretation of the CBA, but we must "look at whether that interpretation and application of the agreement can be reconciled with the language of the agreement. We may vacate an award only if it indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement." *Northumberland Cnty. Comm'rs v. Am. Fed'n of State, Cnty. &*

*Mun. Emps., AFL–CIO Local 2016, Council 86*, 71 A.3d 367, 375 (Pa.Cmwlth.2013) (en banc) (citation omitted) (internal quotation marks omitted).

■ Under the first prong,

[t]he essence test requires a determination as to whether the terms of the agreement encompass the subject matter of the dispute. Where it is determined that the subject matter of the dispute is encompassed within the terms of the agreement, the validity of the arbitrator's interpretation is not a matter of concern to the court.

*Cranberry Area Sch. Dist. v. Cranberry Educ. Ass'n*, 713 A.2d 726, 729 (Pa. Cmwlth.1998) (quoting *Leechburg Area Sch. Dist. v. Dale*, 492 Pa. 515, 424 A.2d 1309, 1312–13 (1981)), *appeal denied*, 563 Pa. 621, 757 A.2d 935 (1999). Here, Shreffler is indisputably protected by the terms of the CBA in his capacity as an elementary school teacher. The question is whether those protections extend to Shreffler when he is acting in his capacity as Head Coach.

In *Harbor Creek School District v. Harbor Creek Education Association*, 146 Pa. Cmwlth. 631, 606 A.2d 666 (1992) (*Harbor Creek I*), the school district sought to eliminate the position of athletic director, a voluntary extracurricular position held by a full-time teacher and member of the bargaining unit. The association challenged the decision as a violation of the collective bargaining agreement, and the district argued that the grievance was not arbitrable. On appeal, this Court held that, as a matter of law, collective bargaining agreements do not apply to teachers when performing extracurricular duties. The Supreme Court affirmed, reasoning that the collective bargaining agreement

---

**2.** Whether or not CASD had just cause to remove Shreffler as Head Coach is a separate issue, not raised by CASD on appeal here or before the trial court. We will, therefore, not address it.

did not contain language from which the arbitrator could establish jurisdiction. *Harbor Creek Sch. Dist. v. Harbor Creek Educ. Ass'n*, 536 Pa. 574, 640 A.2d 899, 902 (1994) (*Harbor Creek II* ). Following *Harbor Creek II*, this Court rejected the argument that arbitrators were prohibited, as a matter of law, from arbitrating disputes regarding non-professional positions. We explained: "Though the Supreme Court noted case law which holds that disputes pertaining to extracurricular work performed by teachers is not arbitrable because it is not professional employment covered by the collective bargaining agreement, its legal analysis and conclusion is based on the 'essence test.' " *Cranberry*, 713 A.2d at 728; *see also Sch. Dist. of City of Erie v. Erie Educ. Ass'n*, 749 A.2d 545, 550 (Pa.Cmwlth.) ("[W]e reject the School District's contention that, pursuant to *Harbor Creek [II ]* `. . . as a matter of law, arbitration provisions of professional employee collective bargaining agreements cannot cover grievances regarding supplemental non-professional employee positions."), *appeal denied*, 568 Pa. 674, 795 A.2d 983 (2000). We have continued to reject this argument and instead analyze the arbitrability of each grievance based upon the language contained in the particular collective bargaining agreement at issue. *See, e.g., Cranberry*, 713 A.2d at 728–29 (concluding grievance about athletic director position was arbitrable).

■ In this case, the Arbitrator relied upon Section 1.5.B in determining that Shreffler was covered by the CBA in his capacity as Head Coach. Section 1.5 identifies various CASD employees who are not members of the bargaining unit, and therefore not covered by the terms of the CBA. It explicitly states that "nothing contained in this agreement shall apply to the benefit of any person otherwise a member of the bargaining unit while employed in any such position." (R.R. 351a.) If subsection B simply provided that "Any person engaged in the summer recreational program, or any recreational program in which such employee's participation is a matter for such employee's voluntary participation" were excluded, then, as the Arbitrator acknowledged, CASD might have prevailed. (R.R. 351a.) Subsection B, however, goes on to provide that: "This clause shall not include employees otherwise members of the bargaining unit engaged in supervising, advising, or assisting in the conduct of any extracurricular activity recognized as such by [CASD]." (R.R. 351a.) If subsection B does not include "members of the bargaining unit engaged · in supervising, advising, or assisting in the conduct of any extracurricular activity," then those members are not excluded under Section 1.5.

The Arbitrator determined that basketball is a recognized extracurricular activity, which Shreffler, as Head Coach, supervises, advises and assists in conducting. (R.R. 24a.) As such, the Arbitrator concluded that Shreffler was exempt from the exclusion of "[a]ny person engaged in . . . any recreational program in which such employee's participation is a matter for such employee's voluntary participation." (R.R. 351a.) This is not only a rational interpretation of the CBA, it is the only possible interpretation that gives effect to the second sentence of Section 1.5.B. If Section 1.5.B were interpreted to exclude professional employees acting as coaches/advisors/etc. who supervise, advise or assist in the conduct of an extracurricular activity from protection under the CBA, then the second sentence of Section 1.5.B would be totally superfluous. Because the Arbitrator's First Award is rationally derived from the language of the CBA and therefore draws its essence from it, the Arbitrator properly exercised her authority over the grievance.

CASD argues that the grievance was outside the scope of the CBA because it was automatically resolved by Section 10.2 of the 2012–2014 CBA. In May of 2012, as Shreffler's grievance was proceeding through the grievance procedure, CASD and the Association entered into the 2012–2014 CBA. The 2012–2014 CBA contains language in Section 10.2, identical to that in the 2010–2012 CBA, which states: "Any issue left unsettled by [CASD] and the Association when this agreement is signed or not referred to in this agreement may not be determined by an arbitrator." (R.R. 379a.) The Arbitrator listed this part of Section 10.2 as a relevant provision, discussed the parties' arguments about it, and cited the testimony of both the PSEA Field Director for the Southern Region and CASD Solicitor indicating that, in the past, at least some of the grievances pending at the time of new CBA continued through the grievance procedure after the new CBA went into effect. (R.R. 19a, 22–23a.) We, therefore, agree with the trial court that "Inherent in the Arbitrator's focus on Section 1.5 is that she found that Section 10.2 did not preclude Shreffler's grievance from continuing to arbitration when the new CBA was signed in May of 2012," and that although it would have been helpful for the Arbitrator to explicitly state her reasoning regarding Section 10.2, the fact that she did not does not mean her First Award was not rational. (Trial Ct. Op. at 4 & n.2.)

CASD argues that the grievance was outside the scope of the CBA because the grievance procedure in Article X applies only to "professional employees." CASD correctly notes that Article X, outlining the grievance procedure, speaks only in terms of "professional employees." (R.R. 377–81a.) "Professional employees" as defined by the CBA, are those employees who are members of the bargaining unit, holding specific enumerated positions including that of classroom teacher, and "otherwise included within the definition of . . . 'professional employee' as contained in the Public School Code [3] of the Commonwealth." (R.R. 349a.) Shreffler, as a fifth-grade teacher, meets all these qualifications, and per the Arbitrator's First Award as discussed above, is not excluded from the bargaining unit by virtue of being Head Coach under Section 1.5.B. Because Shreffler is not excluded under Section 1.5.B, he is a member of the bargaining unit, and thus a "professional employee" under the terms of the CBA. As a professional employee, Shreffler is clearly entitled to make use of the grievance procedure outlined in Article X.

CASD also argues that the grievance was outside the scope of the CBA because the CBA does not address the appointment of coaches. This argument, however, misses the point, as this case is not about the *appointment* of Shreffler as a coach, but rather about the *retention* of a professional employee serving as a coach. Under the Arbitrator's interpretation of Section 1.5.B, Shreffler is protected by the CBA when acting in his capacity as Head Coach. One of the protections offered by the CBA is Section 2.6, the just cause provision, which states: "No employee

---

3. Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§ 1–101-to-27-2702. The Public School Code defines "professional employe" as

those who are certificated as teachers, supervisors, supervising principals, principals, assistant principals, vice-principals, directors of vocational education, dental hygienists, visiting teachers, home and school visitors, school counselors, child nutrition program specialists, school librarians, school secretaries the selection of whom is on the basis of merit as determined by eligibility lists and school nurses.

Article XI, Section 1101 of the Public School Code, 24 P.S. § 11–1101.

shall be disciplined, reprimanded in writing, reduced in compensation, or discharged without just cause. It is the intention of the parties that this provision shall not be deemed to modify the tenure provisions of the Public School Code." (R.R. 354a.) As the Arbitrator explained,

hiring is not the issue in the instant case.

This Award by no means guarantees that a coach has the automatic right to continue in that job and that the School Board has no right to replace him or her. But, because of the specific language of Section 1.5B, the right to continue as coach or be replaced is subject to the just cause provisions of the CBA.

(R.R. 41a.) Thus, even if we accepted CASD's argument that the CBA does not address the appointment of coaches, that would not compel a different outcome here, as the issue of Shreffler's right to retain the position absent just cause is something the CBA can rationally be interpreted to address.

■ CASD argues that the Second Award is outside the scope of the CBA because the just cause provision does not apply to coaches. The Arbitrator noted that the just cause provision itself "states only that an 'employee' cannot be reduced in compensation without just cause." (R.R. 40a.) Furthermore, the Arbitrator specifically found that the "Board abrogated the right not to renew a coach's contract when it agreed to Section 1.5B.... [B]ecause of the specific language of Section 1.5B, the right to continue as coach or be replaced is subject to the just cause provisions of the CBA." (R.R. 41a.) As previously discussed at length, the Arbitrator determined that under Section 1.5.B, a professional employee acting as a coach is not excluded from the protections afforded him under the CBA. One of those protections is the just cause provision located in Section 2.6. Thus, because Shreffler as a coach was not excluded from the protections of the CBA, the just cause provision applied to the retention of his position as Head Coach.

CASD's argument to the contrary is unavailing. CASD asserts, in essence, that Shreffler had no continuing expectation of employment because he was subject to annual reappointment by the Board. The evidence contained in the record suggests otherwise. We begin by noting that the record does not contain a copy of any of Shreffler's contracts to serve as Head Coach, or any other contract to coach any sport anywhere with CASD. What the record does contain are the minutes from various Board meetings over the last decade, in which the Board approved a prepared list naming the various "Coaches/Club/Activities Advisors" for the next school year. (R.R. 618a.) Also in the record is Shreffler's testimony that after going through application and interview process for the Head Coach position in 1997, the only "process to continue to be the coach" was "[j]ust wanting to be the coach." (R.R. 163–64a.) He further testified that at no point between 1997 and 2011 was the position of Head Coach posted or interviewed for, nor was his retention individually voted on by the Board. (R.R. 165a.)

Furthermore, the CBA contains Section 6.2 which states, in pertinent part:

The extracurricular salary schedule as set forth in this agreement and identified as Exhibit E indicates the compensation which has been agreed to be paid for the extra work listed herein. A professional employee serving as such advisor or sponsor shall notify by May 1 his or her respective principal in the event he or she does not wish to continue as such advisor or sponsor.

(R.R. 364a.) Exhibit E, titled "Extra Duty Salary Schedule Pay Per Advisor," contains a section entitled "Athletics," in which various coaching positions are placed into categories and extra duty pay is assigned by category. (R.R. 406–12a.)

Finally, we note that in this case the Board did not simply approve a list of coaches and advisors which listed someone other than Shreffler as Head Coach, although they did do that at the August 8, 2012 meeting. (R.R. 659–60a.) Rather, three months prior to the August meeting, the Board specifically placed on the agenda for the April 25, 2012 meeting a motion not to renew Shreffler's contract. (R.R. 307a, 599–600a.) At the April meeting, which was held at a special location in order to accommodate the anticipated crowd (R.R. 285a), the Board voted not to renew Shreffler's contract for the 2012–2013 school year. (R.R. 248a, 251–52a, 255a, 261a, 262a, 281a).

Based upon this evidence, the Arbitrator's determination, inherent in her conclusion that the just cause provision applies, that Shreffler had at least some continuing expectation of employment as Head Coach, was rational. Furthermore, the annual perfunctory vote of the Board to renew coaching and advising contracts *en mass* is insufficient, especially in light of Shreffler's testimony and Section 6.2 of the CBA, to demonstrate that Shreffler had no expectation of continuing employment as Head Coach.

Lastly, CASD argues that the Awards are not rationally related to the CBA because the Arbitrator focused on Section 1.5.B and blatantly disregarded the following provisions of the CBA: the management rights clause in Section 4.1, the just cause provision in Section 2.6, the grievance procedure in Article X, the finality clause in Section 14.9, and limitations on the arbitrator's authority in Sections 10.2

and 10.3. We disagree. The Arbitrator specifically noted that the parties' briefs "addressed, inter alia, just cause, the right of [CASD] to unilaterally appoint/retain coaches, the fact that coaches' salaries are bargained for and appear in the CBA, the role of past practice in retention of coaches, management rights, limitations on an Arbitrator's authority, and the finality clause," and that she "carefully studied all of the documents presented by the parties." (R.R. 23a.) The allegation that the Arbitrator did not consider Sections 4.1 and 2.6 is without merit, as she discusses both provisions and makes specific findings about each in her Second Award. (R.R. 40–42a.) We have already addressed the Arbitrator's treatment of Article X and Section 10.2 and will not repeat it here.

As for Section 10.3, we see no indication that the Arbitrator disregarded this provision, which defines a grievance as "disputes involving the interpretation o[r] application of particular articles of this agreement and involving alleged violations of the agreement," states that the arbitrator may not change wage structure or scales, and provides that the arbitrator "shall have no power to add to, or subtract from, or modify, any of the terms of this agreement; nor shall they substitute their discretion for that of [CASD] or the Association where such discretion has been retained by [CASD] or the Association." (R.R. 379a.) The present case is clearly a "dispute[ ] involving the interpretation o[r] application of particular articles" of the CBA, so the Arbitrator clearly did not disregard the definition of grievance. Furthermore, nothing in either Award suggests that the Arbitrator has modified, in anyway, the terms of the CBA. Interpreted, them, yes. Interpreted them in ways in which CASD did not intend, to be sure. That, however, does not mean that she exceeded her authority. Section 10.3

did not require any explicit interpretation by the Arbitrator, and so long as she did not violate its terms, she cannot be said to have disregarded it.

CASD argues that Section 14.9, the finality clause, like Section 10.2, bars consideration of the instant grievance because the 2012–2014 CBA was negotiated while Shreffler's grievance was pending. Section 14.9 states that the parties "voluntarily waive[ ] the right to bargain collectively with respect to any subject or matter referred to or covered in this agreement, or with respect to any subject or matter not specifically referred to or covered in this agreement." (R.R. 393a.) At no point in this process did anyone attempt to collectively bargain about Shreffler's grievance. Neither settlement nor arbitration constitute "collective bargaining," which is the only thing prohibited by Section 14.9. Section 14.9, therefore, is irrelevant to the case at hand, and the Arbitrator was not obligated to discuss it simply for the sake of explicitly addressing it.

We conclude, therefore, that the Arbitrator's First and Second Awards are both within the scope of the CBA and rationally related to the terms of the CBA. As such, we will not disturb the Awards.

The order of the trial court is hereby affirmed.

### ORDER

AND NOW, this 8th day of July, 2015, the order of the Court of Common Pleas of the 39th Judicial District, Franklin County Branch, is hereby AFFIRMED.